SUPERIOR COURT 
 
 CORCORAN MANAGEMENT COMPANY, INC. and others[1] vs. FIREGUARD AUTOMATIC SPRINKLER COMPANY, INC. and others[2]

 
 Docket:
 1882CV00317
 
 
 Dates:
 March 18, 2020
 
 
 Present:
 /s/Paul D. Wilson Justice of the Superior Court
 
 
 County:
 NORFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT J.B. ENGINEERING INC.'S MOTION FOR SUMMARY JUDGMENT
 
 

             This lawsuit arises from damage to an apartment building owned by Plaintiffs Corcoran Management Company, Inc. and Southfield Commons LLC (collectively the "Owners"). The other three Plaintiffs are insurers who paid the claims of the Owners (the "Subrogees") concerning that damage. The Owners and the Subrogees sue Defendants Fireguard Automatic Sprinkler Company, Inc. ("Fireguard"), J.B. Engineering, Inc. ("J.B. Engineering"), and Norel Service Co., Inc. ("Nord"), who designed, installed, inspected, and maintained the fire suppression system that allegedly leaked and caused the damage.
            The general construction contract for the apartment building contained a subrogation waiver barring the Owners and their Subrogees from pursuing the contractor, subcontractors, and sub-subcontractors for amounts paid by insurers for damages caused by the contractor, subcontractors, or sub-subcontractors. Defendant J.B. Engineering, asserting sub-subcontractor status and seeking the protection of that waiver, moves for summary judgment.
---------------------------
[1]Southfield Commons, LLC; Lexington Insurance Company; Certain Underwriters at Lloyd's of London; and Sirius International Insurance Corporation UK Branch, Subscribing to Policy Number N16NA19002, as Subrogees of Corcoran Management Company, Inc. and Southfield Commons LLC.
[2]J.B. Engineering, Inc. and Norel Service Co., Inc.
                                                            -1-
            I have reviewed the summary judgment record and the parties' briefs. I heard argument on February 18, 2020. For the reasons set out below, I will allow J.B. Engineering's motion for summary judgment as to the $918,285.54 payment made by the Subrogees, and deny J.B. Engineering's motion for summary judgment as to the Owners' uncompensated damages.
BACKGROUND
            I consider the following facts, from the summary judgment record, in the light most favorable to Plaintiffs as the non-moving parties.
            Southfield Commons LLC entered into an AIA A101-2007 standard form construction contract with Plumb House, Inc. ("Plumb House") dated March 23, 2011, in connection with a new construction project (the "Project") at the Southfield Commons apartment building located at 200 Trotter Road, South Weymouth, Massachusetts. See AIA Document A101-2007, Exhibit A to Affidavit of Daniel Lagosh, Jr., Esq. ("Lagosh Aff."). The AIA A201-2007 General Conditions of the Contract for Construction (the "General Conditions") form a part of the construction contract. See General Conditions of the Contract for Construction, Exhibit B to Lagosh Aff. Section 11.3.7 of the General Conditions contains the subrogation waiver provision at issue ("the Waiver of Subrogation").[3]
---------------------------
[3] Section 11.3.7 of the General Conditions states:
§ 11.3.7. WAIVERS OF SUBROGATION
The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.
                                                            -2-
            Plumb House, as the general contractor, hired Defendant Fireguard as a subcontractor to install a dry fire sprinkler suppression system at the Project. Fireguard, in turn, hired Defendant J.B. Engineering, the moving party, to provide professional fire suppression system design and construction administration services for the Project, although not by written contract. Norel, the remaining Defendant, was responsible for inspecting and maintaining the fire suppression system after installation.
            After the completion of the Project, on December 15, 2016, the Subrogees issued an insurance policy to the Owners that covered property damage to the apartment building. On March 5, 2017, water trapped within a dry fire suppression line froze and caused a pipe to rupture. The ruptured pipe triggered the suppression system, allowing water to flow and damage multiple apartments. The Owners filed a claim in the amount of $1,013,650.90 for the damages. The Subrogees paid the Owners $918,285.54 under their insurance policies. The difference between the two numbers included a deductible of $25,000 and the depreciation value of $70,365.36.
            Seeking to recover the damages caused by the allegedly faulty fire suppression system, the Owners and the Subrogees filed this lawsuit against Defendants alleging negligence, gross negligence, breach of contract, and breach of warranty. Defendant J.B. Engineering now moves for summary judgment, contending that the Waiver of Subrogation in the AIA construction contract prevents Plaintiffs from recovering damages from J.B. Engineering.[4] In opposing the
---------------------------
[4]In its motion for summary judgment, J.B. Engineering also contended that it was entitled to judgment because Plaintiffs are suing it for professional malpractice but had not provided any expert opinion that J.B. Engineering had breached the applicable standard of care. However, by the time Plaintiffs served their response to this motion, they had produced an expert opinion to that effect from an engineer, which is in the summary judgment record. The parties agreed at oral argument that the production of this report made the expert opinion issue moot. Therefore I will not address it.
                                                            -3-
motion for summary judgment, Plaintiffs make the following arguments: (1) the Waiver of Subrogation does not cover the post-construction damages, such as those in this case; (2) Defendant J.B. Engineering is not protected by the Waiver of Subrogation because it did not perform Work at the Project site; (3) J.B. Engineering is not a sub-subcontractor covered by the Waiver of Subrogation; (4) the Waiver of Subrogation is not enforceable in the face of J.B. Engineering's allegedly grossly negligent misconduct; and (5) the Owners suffered uncompensated damages outside the scope of the Waiver of Subrogation.
DISCUSSION 
            Summary judgment is granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56(c); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17, (1989). The court views the evidence in the light most favorable to the non-moving party but does not weigh the evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-371 (1982).
            Applying this standard, I find that there are no material issues of fact that prevent me from deciding, as a matter of law, that the Waiver of Subrogation bars the Subrogees from suing Defendant J.B. Engineering for the subrogated insurance payment of $918,285.54. The Owners' damages uncompensated by insurance, however, are outside the scope of the Waiver of Subrogation. Therefore, I allow J.B. Engineering's motion for summary judgment in part as to the $918,285.54 payment made by the Subrogees and deny in part as to the Owners' uncompensated damages.
                                                            -4-
I.          Applicability of the Waiver of Subrogation to Post-Construction Events
            Plaintiffs argue that the Waiver of Subrogation has no effect in this case, because the damages resulted well after the construction project was complete. However, the Massachusetts Appeals Court held to the contrary in MiddleOak Ins. Co. v. Tri-State Sprinkler Corp., 77 Mass. App. Ct. 336, 338 (2010) (holding that the subrogated insurance company cannot sue a subcontractor for post-construction property damages because of the subrogation waiver in the AIA contract).
            In MiddleOak, after a fire damaged an apartment complex, the insurance company paid the owner more than $4 million under an insurance policy issued approximately two years after the completion of the apartment complex. Id. at 337 n.2. The insurance company then initiated a subrogation action against the contractor and the fire suppression subcontractor involved in building the complex. As in today's case, the insurance company alleged negligence by the contractor and subcontractor during the construction phase that resulted in damage well after they had completed construction and the apartment complex was occupied. Id. at 336-337. The MiddleOak court held that "the contractual provision for waiver of subrogation applies to post-construction losses as well as to losses during construction. The pertinent contractual language reflects the parties' expressed intent to extend the applicability of waiver of subrogation to postconstruction loss." Id. at 338.
            The "pertinent contractual language" cited by the MiddleOak court included this provision in the General Conditions: "if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Subparagraph 11.4.7 [the waiver of subrogation]." Id. at 337. This contract language was
                                                            -5-
important to the court's decision that the waiver of subrogation applied not only to property insurance obtained during construction, but also "to property insurance obtained by the owner after completion of the project." Id. at 338. And this contract language appears verbatim in the contract at issue here. See General Conditions, Exhibit B to Lagosh Aff., § 11.3.5.
            In addition to divining the intent of the parties from the language of the Waiver of Subrogation and other relevant contract provisions, the MiddleOak court also surveyed law from other jurisdictions. The court's conclusion: "Among those jurisdictions that have considered the issue, the great weight of authority holds that the AIA provisions regarding waiver of subrogation are not limited to losses during the construction period and apply as well to post-construction losses that are covered by insurance." MiddleOak, 77 Mass. App. Ct. at 338 (collecting cases).
            In response, Plaintiffs cite only one case, Lumbermens Mut. Cas. Co. v. Grinnell Corp., 477 F. Supp. 2d 327, 332 (D. Mass. 2007). There the United States District Court held that the subrogation waiver applies to post-construction coverage only when the owner is under a contractual obligation to provide such post-construction coverage. However, the MiddleOak court expressly rejected that position, finding the federal district court's reading in Lumbermens  "too crabbed" and concluding that "waiver of subrogation results . . . if the owner secures coverage for the property after final payment." MiddleOak, 77 Mass. App. Ct. at 339. The MiddleOak court was cognizant that insurance companies might issue post-construction policies subject to subrogation waivers unbeknownst to them. However, "[a]n insurer. . . has numerous ways of protecting itself against unknown subrogation waivers." Id. at 339 n.5.
            In short, interpreting identical contract language, the MiddleOak court found that "the pertinent contractual language [of the AIA subrogation waiver provision] reflects the parties'
                                                            -6-
expressed intent to extend the applicability of waiver of subrogation to post-construction loss." Id. at 338; see also Argonaut Great Cent. Ins. Co. v. DiTocco Konstruction, Inc., 2007 U.S. Dist. LEXIS 93846, at *30 (D.N.J. Dec. 21, 2007) (holding that the subrogation waiver applies to post-construction losses and that the plain language of the AIA General Conditions obviates the need to ascertain the contracting parties' intent). Therefore, contrary to Plaintiffs' contention, there are no material issues of fact as to the contracting parties' intent concerning the time limitation of the Waiver of Subrogation.
II.        Applicability of the Waiver of Subrogation to J.B. Engineering
            Plaintiffs next contend that there are material issues of fact about whether J.B. Engineering performed any "Work" at the Project site. Since the Waiver of Subrogation only covers "property insurance applicable to the Work," Plaintiffs argue, there are material issues of fact as to whether J.B. Engineering is covered by the Waiver of Subrogation. Plaintiffs specifically point to J.B. Engineering's answers to the interrogatories stating that "J.B. Engineering does not install or preform [sic] any work on the site." J.B. Engineering's Answers to Plaintiffs' Interrogatories, Exhibit E to Lagosh Aff., at No. 3. However, in the same answer, J.B. Engineering also stated that "JB does not perform 'work' but instead `services'." Id. J.B. Engineering then answered in detail about the specific services it provided in connection with the Project, which Plaintiffs do not contest.[5]
            Section 1.1.3 of the General Conditions defines "Work" as "the construction and services  required by the Contract Documents. . .and includes all other labor, materials, equipment, and services provided or to be provided. . . ." Exhibit B to Lagosh Aff. § 1.1.3 (emphasis added).
---------------------------
[5] J.B. Engineering answered that "Tracy M. McHugh [of J.B. Engineering] worked on the design only for the sprinkler system," and that "James N. McHugh [of J.B. Engineering] reviewed the design of the sprinkler system and approved these plans for submittal to the Weymouth Building and Fire Department for their approval." Id.
                                                            -7-
This definition does not require that services be provided at the site of the Project. Therefore, since Plaintiffs do not dispute that J.B. Engineering rendered services in connection with the Project, I find that there are no material issues of fact that J.B. Engineering performed "Work" within the meaning of the AIA contract.
III.       J.B. Engineering's Sub-Subcontractor Status
            The parties agree that the Owners entered an AIA contract with Plumb House on March 23, 2011, in connection with the Project. Plumb House, in turn, entered a written subcontract with Fireguard on June 11, 2011, to install the dry pipe fire suppression system.[6] Plaintiffs contend, however, that there are material issues of fact as to whether J.B. Engineering is a subcontractor to Fireguard (and thus a sub-subcontractor to Plumb House), a status required for the Waiver of Subrogation to apply.
            Section 5.1.2 of the General Conditions of the AIA contract provides that "a Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site." In light of this explicit definition, the determination of J.B. Engineering's sub-subcontractor status is a question of law informed by the underlying facts. J.B. Engineering is a sub-subcontractor within the meaning of the AIA contract if J.B. Engineering (1) had a contract with Fireguard, and (2) was obligated by the contract to perform a portion of the Work at the site. Plaintiffs dispute both underlying factual issues, which I will address below.
            a. The Contract between Fireguard and J.B. Engineering
---------------------------
[6] Plaintiffs assert that no contract between Plumb House and Fireguard has surfaced. However, J.B. Engineering has appended the contract to its Reply Brief as Exhibit M.
                                                            -8-
            Plaintiffs contend that there are material issues of fact as to whether Fireguard had a contract with J.B. Engineering in connection with the Project. Plaintiffs point to Fireguard's superintendent Peter Celestino's deposition testimony that, they say, indicates that Fireguard did not have a contract with J.B. Engineering.[7] However, Mr. Celestino explicitly admitted during his deposition that he was not responsible for negotiating the agreement between Fireguard and J.B. Engineering and that he did not know whether there was a written or verbal contract between Fireguard and J.B. Engineering. Celestino Deposition, Exhibit H to Lagosh Aff., 78:1379:4; 80:11-19. Therefore, Mr. Celestino's deposition testimony does not raise a genuine issue of material fact concerning the existence of a contract between Fireguard and J.B. Engineering, because Mr. Celestino testified that he lacks personal knowledge on that subject.
            The definition of sub-subcontractor in the General Conditions of the AIA contract does not require that the contract between the subcontractor and the sub-subcontractor be in writing. J.B. Engineering asserts that it entered a verbal contract with Fireguard to design and inspect the fire suppression system at the Project site. This assertion is supported both by the affidavit of James McHugh, J.B. Engineering's president, and by the deposition testimony of Robert Odell, Fireguard's then-president and owner. McHugh Affidavit, Exhibit F to Lagosh Aff., ¶9; Odell
---------------------------
[7] It is not obvious that Mr. Celestino actually affirmatively stated that Fireguard did not have a contract with J.B. Engineering for the work in connection with the Project. The line of questioning that led to Mr. Celestino's statement about the contractual relationship between Fireguard and J.B. Engineering went as follows:
Q: Okay. And who would have hired — who would have hired Fireguard, do you know?
A: It would have been Plumb House.
Q: Plumb House?
A: Yup.
Q: And then who has the relationship with J.B.? Do you hire J.B.?
A: We would have hired — yeah, we would have hired them.
Q: Okay. Was there a contract that you would have had with J.B.?
A: No, not really. Not a contract. . . .
Celestino Deposition, Exhibit H to Lagosh Aff., 28:11-22. The progression of this line of questioning, especially the use of subjunctive mood, suggests that Mr. Celestino was talking about a hypothetical situation or a general course of conduct, rather than testifying about what actually happened with regard to the Project. I do not need to consider this issue, though, because, in the portion of his deposition cited in the next sentence of this Memorandum of Decision, Mr. Celestino testified that he lacked personal knowledge about whether or not there was a contractual relationship between Fireguard and J.B. Engineering.
                                                            -9-
Deposition, Exhibit G to Lagosh Aff., 69:1-12; 71:23-72:3. Plaintiffs did not proffer any facts to dispute the existence of the verbal contract between Fireguard and J.B. Engineering, and so I find no genuine issue of material fact in this regard.[8]
            Plaintiffs contend, however, that any verbal contract between Fireguard and J.B. Engineering is unenforceable for violating the Statute of Frauds. Plaintiffs argue that since the work performed by J.B. Engineering on the Project took more than one year to complete, the contract needed to be in writing. This argument fails both factually and legally.
            First, Plaintiffs use the contracting date between the Owners and Plumb House as the starting date to calculate the period for J.B. Engineering's performance. There is no evidence that Fireguard and J.B. Engineering entered their verbal sub-subcontract on the same date when the Owners and Plumb House entered their general contract. Second, the writing requirement under the Statute of Frauds applies only when the contract by its terms cannot be performed within one year of its making. Boothby v. Texon, Inc., 414 Mass. 468, 479 (1993). The actual period of performance, as Plaintiffs present here, is irrelevant to this inquiry.
            Finally, Plaintiffs also contend that J.B. Engineering breached a contractual requirement set forth in the Waiver of Subrogation. Section 11.3.7 of the General Conditions, the Waiver of Subrogation provision, says that the general contractor shall require all subcontractors and sub-subcontractors to provide a subrogation waiver, "written where legally required for validity," in favor of other parties enumerated in the general contract.[9] Plaintiffs argue that since J.B.
---------------------------
[8] During his deposition, Fireguard's then-president and owner Mr. Odell was asked, "Was J.B. a subcontractor to Fireguard for this project at 200 Trotter Road?" He stated that he was "not really sure of the legal status of what they were." Odell Deposition, Exhibit G to Lagosh Aff., 71:18-22. This statement does not create a genuine issue of material fact about the existence of a sub-subcontract, because it concerns an issue of law, not fact. In any event, the testimony of Mr. Odell, apparently a non-lawyer, is inconclusive on this question of law.
[9] The relevant part of Section 11.3.7 states:
The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein.
                                                            -10-
Engineering did not enter into any written agreement with Fireguard, it failed to provide the legally required written subrogation waiver and therefore could not enforce the Waiver of Subrogation against the Subrogees.
            I do not need to reach the question of whether J.B. Engineering is legally required in Massachusetts to provide a written subrogation waiver. The Massachusetts Appeals Court has held that it does not constitute a material breach of the AIA contract when the general contractor fails to obtain a subrogation waiver from the subcontractor. N. Am. Specialty Ins. Co. v. Payton Constr. Corp., 80 Mass. App. Ct. 367, 370-371 (2011). The failure to obtain a subrogation waiver from the subcontractor does not invalidate the subrogation waiver in the general contract, nor does the failure render the subrogation waiver in the general contract unenforceable. Id. Therefore, even assuming that J.B. Engineering failed to provide a subrogation waiver — written or otherwise — in favor of all other parties enumerated in the general contract, the Subrogees are still bound by the Waiver of Subrogation.
b. The Performance of Work at the Site
            Plaintiffs next contend that there are material issues of fact as to whether J.B. Engineering performed Work at the Project site. J.B. Engineering's sub-subcontractor status depends on the contractual obligation to perform work, not on the physical location where it performed its work on the Project. The dispute as to whether J.B. actually performed any work at the Project site is therefore irrelevant to the inquiry. But still, as I have found in Section II above, J.B. Engineering performed "Work" at the Project site within the meaning of the AIA contract by rendering services in connection with the Project.
                                                            -11-
            In summary, there is evidence in the summary judgment record that J.B. Engineering had a verbal contract with Fireguard to render services in connection with the Project, and the record contains no evidence to the contrary, so there is no disputed issue of fact. Therefore, applying the definition of "sub-subcontractor" set forth in the General Conditions of the AIA contract, I find that J.B. Engineering was a sub-subcontractor within the scope of the Waiver of Subrogation.[10]
IV.       The Enforceability of the Waiver of Subrogation in the Face of Gross Negligence
            Plaintiffs contend that the Waiver of Subrogation at issue is unenforceable because Plaintiffs allege that J.B. Engineering was grossly negligent. Since there are material issues of fact as to whether J.B. Engineering's alleged misconduct amounts to gross negligence, Plaintiffs argue, the motion for summary judgment should be denied.
            Under Massachusetts law, exculpatory contract clauses cannot shield a party from claims for gross negligence or responsibility for a statutory or a regulatory code violation. Zavras v.  Capeway Rovers Motorcycle Club, 44 Mass. App. Ct. 17, 19 (1997) (gross negligence); Henry v.  Mansfield Beauty Academy, 353 Mass. 507, 511(1968) (code violation). Some courts have treated the subrogation waiver like the exculpatory clause and thus were reluctant to enforce subrogation waivers to exclude liability for gross negligence or code violations. See Fed. Ins. Co. v. Cogswell Sprinkler Co., Inc., 2005 U.S. Dist. LEXIS 45287, at *4 (D. Mass. Feb. 15, 2005) (finding the waiver of subrogation unenforceable when the contractor's negligence in inspecting the sprinkler system violated the Massachusetts Building Code); Fed. Ins. Co. v. CBT/Childs
---------------------------
[10]Plaintiffs argue, in the alternative, that J.B. is a sub-sub-subcontractor by way of the Architect, Plumb House, and Fireguard. As such, Plaintiffs argue, the Waiver of Subrogation does not cover J.B., because the Waiver, read strictly, only extends to subcontractors and sub-subcontractors, but not sub-sub-subcontractors. However, this argument is unpersuasive. Section 5.1.2 of the General Conditions defines a sub-subcontractor as "a person or entity who has a direct or indirect contract with a Subcontractor." Therefore, the number of layers of sub-contractual relationship is irrelevant to the definition of the sub-subcontractor. A sub-sub-subcontractor is still a sub-subcontractor within the meaning of the AIA contract.
                                                            -12-
Bertman Tseckares, Inc., 2007 Mass. Super. LEXIS 153, at *6-7 (2007) (finding the waiver of subrogation unenforceable when the contractor negligently installed a sprinkler system in violation of the Massachusetts Building Code); Am. Ins. Co. v. Siena Constr. Corp., 2007 Mass. Super. LEXIS 554, at *4 (2007) (refusing to grant summary judgment based on a subrogation waiver because there was a dispute over gross negligence). None of these decisions is binding precedent, however.
            In recent cases, judges of this court and the Massachusetts federal court have acknowledged the difference between subrogation waivers and exculpatory clauses, and then, because of the positive public interest served by subrogation waivers, have enforced such waivers even in cases alleging gross negligence. See Great Northern Ins. Co. v. Architectural  Environments, Inc., 514 F. Supp. 2d 139, 143-144 (D. Mass. 2007) (upholding the enforceability of the waiver of subrogation in a case of gross negligence); Amica Mut. Ins. Co. v. Bergmeyer Assocs., 2008 Mass. Super. LEXIS 84, at *11 (2008) (upholding the enforceability of the waiver of subrogation in a code violation case); Metlife Auto & Home v. ADT Security Sys., 2011 U.S. Dist. LEXIS 36742, at *21 (D. Mass. Mar. 10, 2011) (upholding the enforceability of the waiver of subrogation in a case of gross negligence). Well-reasoned opinions from other jurisdictions also favor enforcing the waiver of subrogation even when the underlying liability involves alleged gross negligence. See Jewelers Mut. Ins. Co. v. ADT Sec. Servs., 2009 U.S. Dist. LEXIS 58691, at *14-15 (N.D. Cal. July 9, 2009); Reliance Nat'l Indem. v. Knowles Indus.  Servs., Corp., 868 A.2d 220, 226-227 (Me. 2005); Lexington Ins. Co. v. Entrex Commun. Servs., 749 N.W.2d 124, 126 (Neb. 2008); Abacus Fed. Say. Bank v. ADT Sec. Servs., Inc., 967 N.E.2d 666, 670 (N.Y. 2012); Behr v. Hook, 787 A.2d 499, 502 (Vt. 2001).
                                                            -13-
            The Massachusetts Appeals Court's ruling in MiddleOak is particularly instructive on this issue. The MiddleOak court held that subrogation waivers are enforceable in code violation situations because "[u]nlike a provision that completely exculpates a wrongdoer and leaves the victim without recourse, a waiver of subrogation does not prevent an injured party from being compensated." MiddleOak, 77 Mass. App. Ct. at 337 n.3. The MiddleOak court also noted that "[a] waiver of subrogation serves as an allocation of risk between the parties. It reflects an intention on the part of the parties to relieve each other of liability and look only to one insurer to bear the risk. . . ." Id. (internal quotation marks omitted). Although MiddleOak concerned a case of code violation, the reasoning regarding the enforceability of the subrogation waiver similarly applies to cases of alleged gross negligence.[11]
            In this case, the Owners have already received $918,285.54 in insurance payments. It cannot be said that the Owners were left uncompensated for the damages caused by Defendants' allegedly grossly negligent misconduct.
            Waivers of subrogation can reduce the cost of construction projects by eliminating the need for the contracting parties and their subcontractors to secure multiple insurance policies with overlapping coverage. In the context of a complicated construction project and the related contracts, waivers of subrogation are particularly effective in deterring future litigation. These salutary purposes of the subrogation waiver would be undone if a plaintiff could evade the effect of the waiver simply by saying the words "gross negligence" in its complaint.
---------------------------
[11] Plaintiffs concede as much, themselves citing code violation cases to support their contention that subrogation waivers should not be enforced in cases of alleged gross negligence.
                                                            -14-
            For these reasons, I conclude that the Waiver of Subrogation at issue is enforceable even assuming that J.B. Engineering's misconduct amounts to gross negligence, as alleged but not yet proven.[12]
V.        The Owners' Uncompensated Damages
            Finally, Plaintiffs contend that the Waiver of Subrogation does not preclude recovery of the "more than $200,000" in damages that the Owners incurred "out-of-pocket," which was uncompensated by insurance. Plaintiffs' Response Brief, p. 2. J.B. Engineering asserts that Plaintiffs have been fully compensated by insurance payments of $918,285.54, and that the alleged additional out-of-pocket damages, if any, are immaterial to this action because the Waiver of Subrogation bars any recovery for Plaintiffs.
            I find that the Owners were not fully compensated by insurance for their damages. The Revised Damage Summary sheet provided by Plaintiffs demonstrates that the Owners were paid $918,285.54 by insurance out of the $1,013,650.90 total claimed damages. There is a $95,365.36 difference between these two numbers, including $25,000 as the deductible and another $70,365.36 as the depreciation value. J.B. Engineering's Reply Brief, Exhibit P. J.B. Engineering did not proffer any evidence that the Owners were paid by any other source in addition to insurance. Therefore, since the evidence shows that the Owners were not compensated for the $95,365.36 difference between the claimed damages and the insurance payment, I reject J.B. Engineering's assertion that Plaintiffs have been fully compensated.
            J.B. Engineering contends that the Waiver of Subrogation at issue bars any recovery for Plaintiffs, including the Owners' alleged uncompensated damages. I disagree. The Waiver of Subrogation at issue bars subrogation actions "to the extent covered by property insurance. . . ."
---------------------------
[12] I do not decide whether there are material issues of fact as to whether J.B. Engineering's alleged misconduct amounts to gross negligence, because my conclusion that the Waiver of Subrogation is enforceable in the face of gross negligence makes this issue irrelevant to the outcome of this motion.
                                                            -15-
General Conditions, Exhibit B to Lagosh Aff., § 11.3.7. Therefore, while the Waiver of Subrogation prevents the Subrogees from seeking to recover their insurance payments, it does not bar the Owners from suing for the uncompensated damages that are not covered by insurance.
            J.B. Engineering did not cite any authority to support the assertion that the Waiver of Subrogation at issue bars any recovery for Plaintiffs, including the Owners' damages uncompensated by insurance. On the contrary, courts have repeatedly held that the subrogation waiver does not create a legal impediment for the property owner to seek recourse for the damages uncompensated by insurance. See Anderson Burton Constr., Inc. v. Environmental Control Specialists, Inc., 2018 U.S. Dist. LEXIS 142356, at *2-3 (D. Haw. Aug. 22, 2018) (granting the defendant's motion for summary judgment in part as to the subrogated insurance payment and denying in part as to the deductible); Turner Constr. Co. v. BFPE Int'1, Inc., 2016 U.S. Dist. LEXIS 39161, at *56 n.33 (D. Md. Mar. 25, 2016) (finding that waiver of subrogation applied to the extent of covered losses but that owner could attempt to recover deductible); Gap, Inc. v. Red Apple Cos., 282 A.D.2d 119, 123 (N.Y. App. Div. 2001) (holding that the deductible is an uninsured loss that falls outside of the waiver of subrogation).
            Therefore, notwithstanding the Waiver of Subrogation at issue, the Owners can still seek recourse for the damages they paid out-of-pocket, assuming that they can prove liability and the uncompensated amount at trial. For these reasons, I deny J.B. Engineering's motion for summary judgment in part as to the Owners' uncompensated damages.
CONCLUSION AND ORDER
                                                            -16-
            For the foregoing reasons, Defendant J.B. Engineering's Motion for Summary Judgment, Paper No. 16, is ALLOWED IN PART, as to the $918,285.54 payment made by the Subrogees, and is DENIED IN PART, as to the Owners' uncompensated damages.
@/s/Paul D. Wilson Justice of the Superior Court
@March 18, 2020
                                                            -17-
xxz